Good morning, Your Honor. Paul Cochran representing WPP Luxembourg Gamma Three Sar. An issue on this appeal is whether or not the pleadings of the plaintiff satisfied the heightened pleading standards of the PSLRA. We have from the district court, which you have to know the review of, we have from the district court findings that, in fact, with regard to the founders of the company, Mr. Graf and Mr. Waxman, the pleadings established that there was material information, that there was a duty to disclose, a failure to disclose, and that it was a connection with a securities transaction. In dismissing the case, the judge found that there were two problems with the case against the founders, one Sienta and the other is a loss causation. Let me first address the Sienta issue. In finding that the complaint failed to allege Sienta, the court found that while the, well, let me step back. There was an allegation in this case that in order to obtain the initial contribution, initial investment of our clients, an agreement was entered into which gave our clients the right to know if any of the founders of this startup venture capital company was selling stock. It was pledged that that was an important bit of information to our client. It was important to our client that they know whether the founders were maintaining their interest in the company or selling their stock off. That interest was bound up in an agreement, a right of first refusal and a co-sale agreement, which specifically entitled us to notice if the founders were selling any stock. What we learned- The counsel suggests your notice has been waived. It does. And the waiver is purportedly based upon paragraph 3.9 of the agreement, which allows 60 percent of the voters voting together to waive any rights in the agreement on behalf of all investors. They seem to rely upon the language that was circulated with, I guess, kind of a waiver and suggest that that was the waiver. I'm kind of curious as to is there any specific language in that saying that there's a waiver of the right to notice?  Well, in fact, that's what the district court found there was not. The district court rejected the defendant's arguments on that waiver as satisfying the waiver obligation and found that, in fact, there still was a duty to disclose. It was not effective to waive it because it specifically did not refer to notice rights. In fact, that particular waiver document that they rely upon was not even from the founders. It was from the company, and it didn't suggest that the founders were selling at all. It suggested there was an opportunity for all of the investors to sell to a third party who was interested in some stock. There was no disclosure of the founders' intent to sell, and the waiver document talked about if you were interested, send this form back in, and it will acknowledge a waiver of the right of first refusal and co-sell rights with regard to this sale. No indication whatsoever that the founder was selling. But that having been given to us, probably what prompted our clients, before buying $1.7 million in additional shares, to specifically inquire after that notice was sent to us, are any founders or investors selling shares related to this offering? The district court, in connection with Mr. Huey, found that the response to that, which failed to give us any information, may not have been misleading. And I'll deal with the Huey issue now. But the district court did not find that the founders' role with regard to that, found that it was not effective with regard to the founders. The reason the founders were let out on Soyenta was the court found that we didn't allege facts would prove that the founders didn't believe there was an effective waiver, either by the battery in index votes or perhaps by this particular form, although I think the court actually discounted the form. In a de novo review, I would suggest to you that there was no basis for that finding or for the dismissal on Soyenta with regard to the founders. On the battery in index, was there a specific form produced among these stipulated documents that was where battery or index themselves signed off the right of first refusal? Absolutely not. There were documents put in by the defendants for judicial notice. Was there one, though, that was signed by battery or index? No, Your Honor. There's no actual evidence here that the waiver actually took place. There's certainly no evidence that battery and index, in connection with doing these deals with the founders, ever waived the Section 3.1 right to notice of a waiver. That's one of the fundamental problems with the defendants' arguments here. Does that waiver have to be in writing? It does. Under Section 3.1, there has to be a written notice. The documents that were put in by the defendants, did they include that? They did not. There was no evidence that a vote actually took place or that battery and index actually waived. They're assuming the purpose of dismissing this case that there was a waiver, at least with regard to the transactions in May of 2007 and in January of 2008. There's no allegation in the complaint at all that could sustain any waiver by battery and index in connection with the October of the sixth sales. You had three separate sales of stock by the founders over a 15-month period with no notice to WPP. And what they're suggesting now is that this went on, we didn't get the notice, we didn't get our rights, we didn't get to participate in the co-sale, but that they were entitled to believe that that was okay because there was a right under Section 3.9 to waive. But the 3.9 section cannot possibly be read to suggest that a notice of waiver could be waived. It's inconsistent. The defendants themselves point to California law that you have to read all these sections together and not to give precedence to one over the other to make it a nullity. Here, you can do that. Section 3.9 allows a waiver on a vote taken together on behalf of all parties, but it doesn't allow you to waive the waiver notice provision of Section 3.1. That would be impossible. Every time you did that, you'd have to give notice that you waived the waiver provision, and it would go on infinitum. There's just no physical ability to do that. But more importantly, the suggestion that they could have relied upon this, and that's why our pleading was sufficient, there are no facts in the record upon which to support that inference. This comparative analysis that the case law calls upon to determine whether the more compelling inference of guilty knowledge or a more compelling inference of innocence has to be based upon the facts. And the facts here are that this was a secretive transaction over a 15-month period, that they kept this from us, and that they did it deliberately, that they avoided mention of this in any board meetings, that the company waived its rights without the principal stockholder ever knowing about it, and they want you to believe that they believed that was appropriate, that the majority of the shareholders could waive the rights of the minority to participate in these sales where those rights were conditioned to the investment, the original investment. There's just no basis for that reading. But more importantly, Judge, in connection with this we believed it, if you look at Section 3.9, which is the basis for their claim that there's no sienta, that they relied upon this, Section 3.9 says that the waiver, if it's to be a waiver, has to be on behalf of all investors. And aside from the implication that we would argue that it may be in the interest of or for the benefit of, because it would make no sense to allow them to just wipe out our rights, the least has to be on behalf of all investors. And what the allegations in this pleading are, and what you have to accept is true for purposes of de novo review, is that that never happened, that they're relying upon this alleged waiver by Battery and Index, when in fact Battery and Index participated in every one of these sales with the founders. They co-sold. You may want to move to one or two other of your claims, or one or two other of your allegations. Yes, let me talk about that. For instance, let's go to the one where you suggest that the district court incorrectly held that you had failed to state a claim against Spot Runner. Spot Runner, Judge, I think the allegations are very weighty against it. Well, where did you plead that Spot Runner used purportedly inside information when it sold the stock? You know, Judge, I think the inside information is a red herring. The Spot Runner claim... Well, isn't it an insider trading claim that you're pursuing? It's a denominated insider trading claim, but it has to do with a company and its obligations to disclose to an existing shareholder. And Judge Fletcher has written... Where did you plead that Spot Runner not only knew, but consciously used its knowledge of information in order to induce WPP to purchase additional shares? We plead that Spot Runner... Where does it plead? Where do you plead that? That Spot Runner deliberately induced it? Let me see. I mean, I don't intend to use your time because you're running out of time, but I looked in there. I could not find where you had pled that Spot Runner purportedly used inside information. I didn't see that you pled Spot Runner not only knew, but consciously used the information in order to induce your client to purchase the shares. And lastly, I wonder why Spot Runner would enable the founders to divest their shares of their expense at Spot Runner's expense. Well, first of all... I guess I'm having a tough time with those. The founders and the parties who participated in this effort controlled Spot Runner. They were the board. I understand, but I'm looking at Spot Runner. Spot Runner itself. Why would Spot Runner enable the founders to divest their shares at Spot Runner's expense? I think that the insiders were using Spot Runner to their own ends. Where do you allege that they did that? Throughout the complaint, Judge. We allege a scheme to defraud that involved the board members and the founders waiving Spot Runner's rights and then doing this outside the board meeting and facilitating the ability to do these secretive trades. And then we allege, and this goes to Spot Runner's liability, that in May of 2007, when we were going to buy this additional stock that was made available, we specifically asked Spot Runner, not the founders, we asked Spot Runner, its general counsel vice president, are there any founders or investors selling? And the answer came back no. Now, this court is telling... Just a minute. In that question, you're talking about the one question you sent to Huey? That's correct. In that question, you said, in the context of WPP share purchase, any investors selling their shares related to this offering? If so, who's selling and how many shares are they selling? Correct. I didn't find anything in there to see even what offering that question was intended to find. Because that question is in the context of a series of e-mails over the past... So if I don't find in that series of e-mails what you're about to tell me, then you're wrong? I'm not sure what that means, Judge. You think a series of e-mails is the only way you're going to get to that correct answer? Because I looked at those e-mails and I can't tell even reading those e-mails. I think it's a jury question. The fact of the matter is we asked for the information and we didn't get it. And I think even if Huey hadn't given us the response... You may have some claim on a duty to disclose, but he doesn't really answer your question. No. But it's that deceptive response where you have a specific... Here's what the defendants argue, both on Huey's duty and on the Santa. They argue that it was reasonable for Huey to understand that question to mean, are the founders selling stock in a primary sale share? But that's not a reasonable inference at all. The founders couldn't. A primary share sale is a share by the... I understand. This was a secondary sale, but your question couldn't have gone to the primary sale. That's right. But their response obviously wasn't a response to your question about the secondary sale. That's where we would differ, Judge. We think that's a fact. It should be quite honestly. It is. What it said was no. What it said was this is just primary sales. In other words, you're not selling. We have no reason to believe anybody else is selling either. We had no notice that there were any waivers going on. We didn't know that the founders had ever sold shares before. There was no reason for us to believe that the founders were selling. And in fact, we weren't selling. So when they came back at this stage and said no, this is a primary sale only, that was the equivalent of a no answer because they had an obligation to tell us even if we hadn't asked. Because the company had to tell us that the founders were dealing in the stock in violation of their obligations to us and their fiduciary duties. And for us to buy stock, the company had to disclose to us what was going on. It's material information. There's a trust relationship between the corporation and its existing shareholders. They had to tell us that even if we didn't ask. But we did ask. And what did we get back in response? We get back an email from you saying this is a primary share sale only. That indicates to the reasonable recipient of that no, nobody else is selling, just like we're not selling. So we bought $1.7 million worth of stock when the founders were in fact selling. And they were selling through the entire 15-month period. That's material information. It certainly bore on our decision to buy. And they withheld the information from us. So, Judge, that is. Do you want to reserve the rest of your time? I do. May it please the Court, Fred Rowley, Jr., for the defendant, appellees, and cross-appellants. We've heard a lot in my friend's presentation about contract language. And so I think it's important to note at the outset that this is a federal securities claim under 10b-5. And under this Court's clear precedence interpreting the PSLRA, the standard is a rigorous one. With respect to Scienter, and this is critical for the founders, this Court has held that the plaintiff must plead in great detail facts supporting a strong inference of Scienter. And with respect to the substantive standard for Scienter itself, in Silicon Graphics, this Court held that that means deliberate or conscious recklessness. Why wouldn't you have talked about any of these stock sales at meetings as to which they had observed her status? Well, Your Honor, that claim is based on a separate agreement. I mean, why wouldn't you? I mean, in terms of whether there was a duty to disclose, you knew it was very important to them to have knowledge about the founders' stock sales, right? Your Honor, yes, Your Honor. The district court concluded that they negotiated that when they made this initial investment. Your Honor, there's nothing under the terms of the board observer agreement that required Spotrunner or the board members to discuss any particular matters. And there's simply no contractual obligation. I mean, can't you draw the inference or suggestion that you didn't bring it up because you intended to mislead them or keep them in the dark? No, Judge Winn. You can't draw that inference. And the reason is this. There's simply no duty. There's no duty under the board observer agreement. There's no duty under Delaware law. The district court correctly determined that there's simply no legal obligation to discuss those sales at board meetings. In terms of this waiver of the right to notice. Yes, Your Honor. Is there any pleading that they filed or any document where you filed where either has specifically signed the document supposedly waiving? Your Honor, the. Battery or index. Battery or index. Judge Winn, the plaintiff's. Exhibit, I guess, is what. Because it has to be in writing, right? Your Honor, there is no exhibit along the lines of what you're asking, but there doesn't need to be one. Because WPP pled in its complaint that the battery and index defendants, and I would note for the court that those defendants are no longer in this case. So the purported co-conspirators aren't in this case anymore. But if you look at the complaint, and I would direct the court, for example, to paragraphs 178 and 179, WPP pleads that the battery and index investors purported to waive their notice rights. Now, in their third brief, they attempt to characterize this waiver as very specific in parsing, but that's fundamentally inconsistent with their now dropped conspiracy theory against the battery and index investors. How could the language at the bottom of circulation, how could that support the notion that someone had waived the right to receive notice? Judge Winn, the sales notice provision, and that's what Your Honor's question is directed at. You're relying on it, isn't it? Your Honor. Is that what you say effectuates the notice or effectuates the waiver? Your Honor, we have a number of arguments with respect to Scienter as to the founders. Our initial argument is this. Even if you take all of the arguments about the contract language that WPP has made, even if you accept all of those arguments, the most that you would conclude is that the contract was ambiguous or, perhaps, that the founders didn't meet the terms of Could we look at the factual background? I mean, you've got a company where your founders have taken 30 or so million dollars out of the company at a time when it's losing 30 to 40 million dollars a year. Your Honor, a couple of You haven't made a profit in any year. A couple of responses to that, Judge Grimm. First, because WPP's claims ultimately rest on contract language, it's important to note that WPP, in its complaint, alleges it's the world's largest media conglomerate. That's very important contextually. And you haven't answered my question. In Scienter determinations, don't we look at the whole factual background? Absolutely, Your Honor. And with respect to founder sales, it's critical to note this. There is no argument that WPP makes on appeal that there's anything inherently suspicious about the size or the pattern The allegation that your founders were selling large amounts of money at a time when you were, it never made a profit Your Honor At a time when you're losing 30 to 40 million dollars a year. Judge Grimm, under this circuit's case law, the size of the founder sales is too suspicious. If you compare the size of the sales to, for example, the size of the sales in a case like Metzler or in Silicon Graphics, they're just too small to give rise to any inherent suspicion. And so they don't support Scienter. That's also true as to the pattern. And that is why you see that WPP doesn't make an argument about that on appeal, isn't trying to rely Their allegation is how much were your revenues in the final year? Your Honor, there are no Your Honor, there are no Were they somewhere in the range of 15 million dollars? Your Honor, I'd have to go back and check the complaint, but there is no 10b-5 claim that is based upon the concealment of information about the company. That's not what this case is about. It's about Part of it is upon the duty to disclose, and the duty to disclose, I thought, was based upon the whole factual background. Your Honor, if you look at the 10b-5 claims, and if you look at the basis for those What's the information that, according to WPP, was supposed to have been disclosed? It's not information about the founder's sales. And that's why they can't I'm sorry, not about But about the company. Nothing about the company's operations. Except against the background of a company that's losing all kinds of money, wouldn't it be important to a typical investor to know that the founders are company shares? Your Honor, under the elements of a 10b-5 claim, you have to plead with specificity what the misrepresentation is, what the omission is. And what is alleged to have been omitted here is not information about the company's finances. It's not information about the company's operations. It's about founder sales. And by the way, that's why WPP can't make out loss causation in any event, because this isn't like a case like Livid, where there was concealed You knew all along that that was important to them. Your Honor, I'm just trying to answer your initial question. Were founder sales known to be important to them? Sure, Your Honor. But again, if you look at the terms of the agreement, they were contemplated. That's why there are provisions in the agreement that address them. But I'd like to get back to your initial question, because this is important, and why they can't make out loss causation. Because this is not a case like Livid, where the allegedly concealed information says something inherently about how the company's performing, what its business operations are doing. What they are Don't they typically say something when you've got a startup and a founder's dumping shares? Your Honor, not without more. It would be one thing. In another case, you could imagine a scenario where the plaintiff has pled that there's something about either the size or the pattern of executive sales that says something about what they knew. For example, if there's a sale on the eve of a bad earnings report or something like that, that's not what you have here. But you're losing 30 to $40 million a year, according to their allegations. Isn't the founder's sale relevant? Your Honor, there are provisions in the contract that clearly indicate that founder's sales are on the table. But the question is whether they have pled a 10-feet-5 claim that shows an intent to defraud for the failure to disclose founder's sales, and they can't even bridge a basic breach of contract in Scienter. They can do it alternatively, right? The contract tends to support, arguably, a duty to disclose. But secondarily, don't you also have a relationship with them that imposes some duty to disclose upon you independent of the contract? Well, sure, Your Honor. But what's pled is the contract. And the subject of that claim is just founder's sales. Founder's sales themselves have to do with who owns the stock. It's not a livid situation where you have concealed information about dire financial conditions. It's not information about the company's operations or performance. It's about who owns the stock. And I would note, because this is a fraud case, that on the record before the court, on the allegations in the complaint and the judicially noticeable documents, this is a fraud in which the purportedly concealed information was disclosed to multiple people, including a supermajority of the stockholders, of the preferred stockholders. They, I thought, make the allegation that somehow that in all these board of directors meetings, you never disclose the fact that you're losing all this money until sometime in 2008. Well, but, Your Honor, if you look at the 10b-5 claims, those are focused on the founder's sales. And as we just noted and as the district court recognized, there is no legal obligation that WPP has identified. Well, maybe it's a matter of contract. They don't have to bring any particular item up at a board of directors. But on the factual background that might impose a duty to disclose, isn't the simple fact that you avoid apparently letting anybody know that you're gushing money, isn't that relevant to the Scienter issue as to whether your founders made a conscious decision to avoid coming clean on their stock sales? Because it would have raised the obvious inference that they were dumping them because the company was going in the tank. Your Honor, under Telabs and under Zucco, you certainly read the complaint as a whole. No question about that. But you do have to take the claims as they come to you and as the plaintiffs have pled them. And what they are pleading here are purported 10b-5 claims that are rooted in what is really ultimately, even if you buy all of the arguments about the contract language, a breach of contract. And the claims focus on founder sales. That's what is at issue here. Our initial position is that even if you buy those arguments, you can't bridge a breach, if that's what it is, and Scienter, but you could even go beyond that. I don't want to belabor this because the other judges may have questions, but just on how do you get around the voting together? Even if you try to make some claim, what do you, voting together, what could that mean? How can you twist that to mean somehow that you don't even have to give notice to the parties that there's a vote? Oh, Judge Goodwin, we're simply using the phrase voting in the same way that WPP does in its complaint. We believe that that phrase means voting your shares. And if you look at paragraph 36. Doesn't together modify the verb voting? Sure it does, Your Honor. In paragraph 36 of WPP's complaint, we find the following phrase. When acting together, they hold the majority of voting shares. And that's the way that we read that language. There's simply nothing in section 3.9 that imposes formal voting requirements. And so we believe that if you take that language and also the language in 3.1, we don't even get to recklessness because what the founders did was supported by a reasonable interpretation of the contract. We're not even in the same ballpark as recklessness. If interpretation's true, why wouldn't they use the investors voting, may waive, discharge, you know, under 3.9? Why would they use the term together? Your Honor, because you have to have the block. You have to have a 60 percent block of stockholder votes, and there may not be just one stockholder who has that block. There may be more than one. And if you take a step back, the purpose of the ---- I don't want to belabor this. Sure, Your Honor. Wouldn't your interpretation make more sense if the language had been that the holders of 60 percent together may waive? But instead, they make the voting that together modifies voting. It doesn't modify holders. Sure, Your Honor. But, again, if you use the phrase in the same way the WPP does, it's voting your shares. And, of course, if you yourself don't hold ---- Don't they use the term together in that phrase? I'll read it again, Your Honor. When acting together, they hold the majority. And they're talking about the battery and index investors. When acting together, dot, dot, dot, they hold the majority of voting shares. And it's not exactly the same phrase, but it is the same idea, and the idea is that you're voting your shares. You're looking at the complaint now? I am, Your Honor. Is there any language similar to that in the actual documents? Your Honor, the language that you quoted from in Section 3.9 is this. It's the holders of 60 percent of the shares held by the investors voting together may waive, discharge, terminate, as Your Honor suggested. But we think that the most reasonable construction of that is just that you've got to have a 60 percent block, and that may be one or maybe more stockholders. That's why you have to have together, because you have to be able to aggregate the position of the stockholders and have more than 60 percent. That's why that language is there. But, again, yes, Judge Smith? I guess my problem with this omission language, which I think is the biggest problem, is that when I look at 3.9, even if I buy your argument upon 3.9, I guess I look back at 3.1, and it seems to me that 3.1 says that the notice of the procedure shall be made to all the shareholders, and I believe that to be a condition precedent with the general waiver. So that if, in fact, there is something that's to be said there, you've got to have, one, 60 percent of the shareholders to vote, and then, two, that the founders provide notice of the waiver. Sure. Or notice of all of this to those others. And 3.1 never got followed. Judge Smith, assume that you're reading of that provision. What you would conclude is one of two things. There's an ambiguity in the contract. I wouldn't conclude ambiguity. You could. I read it. Your Honor, say that. I'm allowed to decide what it says. Sure, Judge Smith. Assume then that, Your Honor, assume then that there is a breach. There's still no pled facts about the founder's state of mind that would permit you to bridge that simple breach of contract and find a strong inference of scienter. Why is that not scienter? Because, Your Honor, as the district court noted, the district court concluded this, that WPP hadn't pled facts that would permit you to conclude that the founders thought this. Just a minute. We know that the defendants knew of their own stock sales between September of 2006 and March of 2009. Sure, Your Honor. They knew of their duties of disclosure in the agreement. Yes, they did. They knew about the duties. They knew about the duties of disclosure in the agreement. Now WPP alleges the defendants also knew, based on the negotiation of the agreement, that as a conditioned precedent to their purchase of 10 million shares, how significant the founders' stock sales would be to WPP, and that WPP would not continue to invest in or support SpotRunner if WPP learned of the founders' stock sales. That's alleged. Then the next allegation. WPP's continued support of SpotRunner was essential to the pump and scheme operations through which the defendants made millions of dollars for personal profit. Now it seems to me that makes sense. Well, Your Honor, what the district court concluded was this, that there were no facts to show. This is a state of mind. We're talking about science here. What kind of a motion is this now? It's a motion to dismiss, Your Honor. All right. We take a look at the plaintiffs now. How do we review a motion to dismiss? It's de novo, Your Honor. De novo. Does it actually matter what the district court decided? No, but the district court's, Judge Anderson's ruling on this score I think is persuasive and what the court concluded was that there were no facts to show that the founders believed this to be a legally ineffective waiver. So assume that they were wrong. Assume they were wrong and there was a violation of Section 3.1, which is the provision that Judge Smith is focusing on. There's still no pled facts to establish a strong inference that the founders thought they had an obligation to disclose and that the battery and index waiver was ineffective because they plead that there was a waiver. So the founders would have to think that that waiver was legally ineffective and flout their obligations anyway. Well, let's go to the waiver. Take me to the actual language that's in – I'll take you to the actual language which is at the bottom of the, you know, the circulated document. What language in there waives the right to receive notice? Your Honor, there's nothing explicit about this. What Your Honor, I think, is getting at is the Section 1.2 right, the sales notice right. Our position is that it's attendant to the right of first refusal agreement and co-sale agreement, that it's really bound up with those rights. But again, even if – even if that doesn't do the trick. The battery and index had waived WPP's right to receive notice. Well, Your Honor, if you look at the allegations and the complaint, and I've cited a couple of paragraphs. You said battery and index had waived WPP's right to receive notice. That's our – that is our argument, Your Honor. And what language in that provision waives that, even if signed by battery and index? Your Honor, it's the allegations and the complaint, because as I – I'll just read a couple of the allegations that WPP – Allegations and the complaint. I'm saying what language in the thing that you rely upon waives the right to receive notice? There's nothing specific in that – in that agreement that says Section 1.2. We believe the language can be read to embrace the Section 1.2 rights. But WPP has pled in broad terms that there was a purported intent on the part of the battery and index investors to waive their rights under the right of first refusal agreement. That's pled in the complaint. I would ask the Court to look at paragraphs 178 and 179 as examples of that language. So the – the waiver – that waiver provision and – and the allegations and the complaint must, of course, be read together. Okay. Thank you. Your overtime. Your Honor, my – my remaining 35 seconds. Let me just – Well, I'll give you a little extra since I gave him four. But I – I have to say, he didn't get the four because he wanted it. He got the four because we made it. So don't be too – don't be too carried away. Judge, I just wanted to say, this – contrary to my friend's allegation, this is not a simple breach of contract. What the – what the pleading is here is that this was not only a breach of contract, but it was the way it was done. It was done secretly. It was done surreptitiously. It was done deliberately to keep us from having knowledge of it. And the board observer rights agreement is a prime example of that. Yes, the agreement doesn't say you have to do everything in front of the board. What it does, it exempts the kind of information you can withhold. It says you don't have to – you don't have to give attorney-client information. Anything that's a conflict of interest, you don't have to. But other information, implicitly, you do have to. The point with the board observer rights pleading is that they went out of their way to avoid discussing these things before the board of directors. And that was normal business – normal course of business kind of activity, which each occasion they took outside the board. That is a fact that weighs in favor of intent to deceive. Doing it secretly is the essence of deceiving. Don't let them know about it. And that's what we pled. Thank you. Thank you very much. Thank you both for your arguments. They were very good, both of you. Thank you very much. And everybody this morning did a good job. These are cases 10-55401, 464, 468, shorthand Luxembourg v. Spa Runner. Thank you very much. Thank you very much, all of you. Thank you. Thank you.
judges: Gwin, Fletcher B. , Smith N. R.